UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 15 B 35358 |
| | ) | |
| LB STEEL, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Honorable Janet S. Baer |
| | ) | |
| | ) | |
| THE OFFICIAL COMMITTEE OF | ) | Adversary No. 17 A 00390 |
| UNSECURED CREDITORS OF | ) | |
| LB STEEL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEELCAST LIMITED AND | ) | |
| STEELCAST, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

This matter is before the Court on the adversary complaint filed by the Official Committee

of Unsecured Creditors (the "Committee") of LB Steel, LLC (the "Debtor") against Steelcast

Limited ("Steelcast")[1] under 11 U.S.C. §§ 547(b) (Count I), 550(a) (Count III), and 502(d) (Count

IV).[2] The Committee seeks to avoid and recover for the Debtor's estate $252,393 in payments

made by the Debtor to Steelcast in the ninety days leading up to the bankruptcy filing. Based on

---

[1] Steelcast, LLC ("LLC") was also a defendant in this adversary proceeding. However, on July 24, 2020, long after LLC had failed to file an answer to the Committee's complaint or to otherwise plead, the Court entered a default order against the company. (Adv. No. 17 A 00390, Dkt. 97.) Accordingly, LLC is no longer a party to this proceeding.

[2] Unless otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532. The Committee brought Count II of the adversary complaint under § 548(a)(1)(B). (Adv. No. 17 A 00390, Dkt 1.) On July 24, 2020, the Court entered an order granting Steelcast's motion for summary judgment as to that count, finding that the Committee had failed to establish that the Debtor received less than a reasonably equivalent value for the payments that it made to Steelcast within two years before the petition date. (*Id.*, Dkt. 96 at 9–10.)

the documentary and testimonial evidence presented at a three-day Zoom trial held in December 2020, as well as a review of all relevant documents, exhibits, arguments, and case law, and for the reasons set forth below, the Court finds in favor of the Committee and against Steelcast on Counts I and III of the adversary complaint and dismisses Count IV as moot. As such, Steelcast will be ordered to pay the Debtor's estate $252,393.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(B) and (F).

## BACKGROUND

The Debtor was a distributor of non-prime steel plates and steel parts for the construction, agriculture, mining equipment, and power generation industries and offered outsourced machining, fabricating, burning, and assembly services to its customers throughout North America. (Adv. Dkt. 1 ¶ 8.[3]) For several years prior to its bankruptcy filing, the Debtor was embroiled in litigation in the Circuit Court of Cook County, Illinois with Walsh Construction Company ("Walsh") and others (the "Walsh litigation"). (Bankr. Dkt. 15 at 4–5, 666 at 3 ¶ 3.[4]) In that litigation, Walsh asserted claims against the Debtor totaling approximately $33 million, and the Debtor asserted claims against Walsh totaling approximately $10 million. (Bankr. Dkt. 666 at 3 ¶ 3.) On October 14, 2015, a $19.2 million net judgment was entered against the Debtor in the Walsh litigation—$27.5 million against the Debtor and $8.3 million in its favor. (*Id.* at 4

---

[3] All references to "Adv. Dkt." are to Adversary No. 17 A 00390.

[4] All references to "Bankr. Dkt." are to the Debtor's chapter 11 case, Bankruptcy No. 15 B 35358.

¶ 6.) Four days later, on October 18, 2015, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. (Bankr. Dkt. 1.)

Shortly thereafter, the Committee was appointed by the Office of the United States Trustee in the Debtor's bankruptcy case under § 1102. (Adv. Dkt. 72 ¶ 1.) Pursuant to the Court's order of October 18, 2016, the Committee was granted authority and standing to pursue avoidance actions on behalf of the Debtor's estate. (Bankr. Dkt. 347.)

As for the defendant, Steelcast is an Indian company with its sole place of business on Ruvapari Road, Bhavnagar, Gujarat India. (Adv. Dkt. 72 ¶ 2.) Steelcast manufactured steel plate, steel parts, and other steel products that were purchased by the Debtor. (Adv. Dkt. 80 ¶ 7.) In the ninety days leading up to its bankruptcy filing (the "preference period"), the Debtor paid a total of $252,393 for goods manufactured by Steelcast. (Adv. Dkt. 44, Ex. A.)

On July 26, 2017, the Committee filed the instant adversary complaint against Steelcast and LLC, seeking avoidance and recovery of the $252,393 in payments made during the preference period, as well as disallowance of any claim that Steelcast or LLC may make against the Debtor unless and until such payments plus interest are returned to the Debtor's estate. (Adv. Dkt. 1.) As of the date of this Memorandum Opinion, neither Steelcast nor LLC has filed any claims in the Debtor's bankruptcy case.[5]

More than two years later, on August 12, 2019 and September 30, 2019, the parties filed cross motions for summary judgment—Steelcast on all four counts of the complaint and the Committee on Counts I, III, and IV. (Adv. Dkt. 44, 52.) As to Count I, the preference claim under § 547(b), the Court found that the Committee had established all but the insolvency element under the statutory provision. (Adv. Dkt. 96 at 8.) In so ruling, the Court pointedly reminded the parties

---

[5] The bar date for filing non-governmental claims was February 1, 2016. (Bankr. Dkt. 127.)

that, when deciding motions for summary judgment in other preference proceedings in the Debtor's bankruptcy, it had specifically held that the insolvency issue was a factual question on which a trial would be needed. (*Id.*; *see also LB Steel, LLC v. CCL Constr. Consultants, Inc.* (Adv. No. 17 A 00468, Dkt. 84); *LB Steel, LLC v. Barsom Consulting, Ltd.* (Adv. No. 17 A 00476, Dkt. 82); *LB Steel, LLC v. Jeffrey L. Garrett and JLG Consulting, LLC* (Adv. No. 17 A 00481, Dkt. 95); and *LB Steel, LLC v. D. L. McQuaid & Assocs., Inc.* (Adv. No. 17 A 00504, Dkt. 84)). As such, the Court granted in part and denied in part the Committee's motion for summary judgment on Count I.[6]

On December 14, 15, and 16, 2020, a consolidated trial was held in this adversary proceeding and in *LB Steel, LLC v. United States Steel Corporation* (Adv. No. 16 A 00353).[7] The only issue at trial was whether the Debtor was insolvent during the preference period. (Bankr. Dkt. 666 at 5 ¶ 15.) After post-trial briefs had been filed but prior to any ruling, the Debtor and United States Steel Corporation ("U.S. Steel") reached a settlement, and an agreed order was entered on September 24, 2021, dismissing the adversary proceeding with prejudice. (Adv. No. 16 A 00353, Dkt. 153.)

**Reliance on Evidence Presented at Trial**

On December 7, 2020, before the commencement of the trial, the Committee filed a motion *in limine*, seeking to bar Steelcast from both presenting evidence on the Debtor's solvency during

---

[6] In Count II of its motion, the fraudulent transfer claim under § 548(a)(1)(B), Steelcast contested only one element—that the Debtor received "less than a reasonably equivalent value" in exchange for the transfers at issue. (Adv. Dkt. 44 at 7–8.) Finding that the Committee had failed to establish that element, the Court granted Steelcast's motion as to Count II. (Adv. Dkt. 96 at 8–10.) Both parties' motions for summary judgment on Counts III and IV, recovery of the avoided transfers under § 550(a) and claim disallowance under § 502(d), respectively, were denied.

[7] The two other adversary proceedings initially included in the consolidated trial were *LB Steel, LLC v. Steel Warehouse Quad Cities LLC and Steel Warehouse Co., LLC* (Adv. No. 16 A 00355) and *LB Steel, LLC v. Janco Steel Ltd.* (Adv. No. 17 A 00339). (*See* Adv. Dkt. 100.) The parties in both adversaries, however, were able to settle their disputes, and agreed orders were ultimately entered, dismissing the proceedings with prejudice. (Adv. No. 17 A 00339, Dkt. 91; Adv. No. 16 A 00355, Dkt. 81.)

the preference period and relying on U.S. Steel's evidence on the solvency issue. (Bankr. Dkt. 668.) Such a bar was appropriate, the Committee argued, because Steelcast had failed to timely disclose "any competent evidence on solvency." (*Id.* at 1.)

On December 14, 2020, prior to the parties' opening statements at trial, the Court heard arguments on the Committee's motion. Steelcast argued that the trial was to be a "combined evidentiary hearing" and that, accordingly, the primary evidence on solvency on which it was relying was going to come in anyway. (Adv. No. 16 A 00353, Dkt. 155 at 8:25–9:5.) In response, the Committee contended that the fact that there was going to be a combined evidentiary hearing did not invalidate the disclosure requirements under the Federal Rules of Civil Procedure. (*Id.* at 9:11–10:11.) Based on the parties' arguments, the Court granted the Committee's motion in part, barring Steelcast from presenting any evidence of its own. (*Id.* at 13:10–14:16.) With respect to Steelcast's reliance on any other party's evidentiary submissions, the Court indicated that the issue would be reconsidered at the end of the trial. (*Id.*)

As noted above, after post-trial briefs had been filed, the Court approved a settlement between the Debtor and U.S. Steel, which resolved the dispute between those parties, and their adversary proceeding was dismissed. (Bankr. Dkt. 709.) As a result, the Court did not rule on the solvency issue.

Several months later, with the instant adversary still pending, the Committee sought a ruling on the remainder of the motion *in limine.* On April 20, 2022, after further submissions by the parties, the Court issued an oral ruling, denying the rest of the Committee's motion and thus permitting Steelcast to rely on the evidence introduced by U.S. Steel at the trial. (Bankr. Dkt. 728.) A summary of that evidence, as well as the evidence introduced by the Debtor on which the Committee relied at trial, is set forth below.

**The Debtor's Evidence in Support of Insolvency**

The Debtor offered three witnesses at trial in support of its argument that it was insolvent during the preference period. The first, Patrick O'Malley, was the Debtor's expert witness who had been initially retained in August 2015 to help the company in negotiations with Walsh in connection with the Walsh litigation. (Tr. at 232:1–4, 240:1–243:11, 263:5–7, 297:6–11.[8]) The other two witnesses were Timothy R. Conway and Edward Keidan, the Debtor's key lawyers in the Walsh litigation.

Much of the testimony of all three witnesses focused on the Debtor's discussions with Walsh in an effort to resolve their dispute. Conway testified that such discussions took place as early as July 2014. (Tr. at 80:21–82:14.) Although he advised the Debtor to settle at that time to avoid a costly trial, Conway said that Walsh had no interest in settling. (Tr. at 81:4–82:14 (testifying that Walsh "didn't even want to have a separate mediation with" the Debtor; Walsh "just said no"), 141:1–7, 165:14–166:3.) According to Conway, the Debtor also had settlement discussions with Walsh in July of 2015, but, again, Walsh gave no indication that it wanted to resolve the dispute and, in fact, asked for over $30 million to settle, $10 million more than it had demanded a year earlier. (Tr. at 82:15–84:5, 104:20–105:4, 153:13–155:6.) Keidan also testified about Walsh's refusal to settle, explaining that Walsh wanted to put the Debtor out of business and was asking for $33 million "and not a penny less." (Tr. at 186:7–187:6, 198:16–199:6.) As for O'Malley, he testified that he had been tasked with trying to settle the Walsh litigation because the Debtor was concerned that, in the event of an adverse judgment, it would be unable to pay and

---

[8] Transcript references ("Tr. at __") are to the pages of the three volumes of the transcript of the evidentiary hearing of December 14–16, 2020, which can be found at Docket Nos. 155–157 of Adv. No. 16 A 00353. Pages 1–270 of the transcript reflect the proceedings on December 14, 2020 (Dkt. 155); pages 271–481 reflect the proceedings on December 15, 2020 (Dkt. 156); and pages 482–624 reflect the proceedings on December 16, 2020 (Dkt. 157).

such a judgment would put the company out of business. (Tr. at 297:6–24.) Although there were ongoing discussions and proposals and counterproposals were being exchanged prior to trial in August 2015, O'Malley said, the gap between what the Debtor could pay and what Walsh was demanding simply could not be bridged. (Tr. 239:17–244:2.)

Given the failed settlement attempts, as well as all of the information that he had gathered in conducting his analysis, O'Malley concluded that the Debtor was insolvent during the preference period. Specifically, O'Malley testified that the Debtor's liabilities exceeded its net asset value by $18.8 million as of July 31, 2015.[9] (Tr. at 330:6–15; Pl. Ex. 2.[10]) In performing his analysis, O'Malley said, he used the orderly liquidation value of the Debtor's assets because that methodology—in contrast to discounted cash flow on a going-concern basis—resulted in the highest value for the assets. (Tr. at 281:14–17, 306:7–12, 309:9–16, 321:6–18, 331:2–10, 451:9–22; Pl. Ex. 2 at 14–15; Pl. Ex. 4 at 2–5.) According to O'Malley, the orderly liquidation value of the Debtor's assets exceeded the going concern value for six primary reasons: (1) In 2015, the Debtor's revenues continued to decline; (2) the Debtor had been sustaining losses since 2013; (3) the American steel industry was "significantly challenged" in 2015, causing most U.S. companies in the industry to forecast continued losses; (4) the Debtor was in covenant default on its operating capital loan from MB Financial Bank ("MB Financial") due to operating losses and additional borrowing; (5) the Debtor was facing a $5 million expense to write down inventory to fair value; and (6) the Debtor continued to be mired in the Walsh litigation, incurring substantial legal

---

[9] Pursuant to his expert report, dated June 28, 2019, O'Malley concluded that the Debtor was insolvent on July 19, 2015 and "all times thereafter." (Pl. Ex. 2 at 17 (see footnote 10 below).)

[10] Exhibit references ("Pl. Ex. __" and "Def. Ex. __") are to the exhibits submitted by the Debtor and U.S. Steel, respectively, and admitted into evidence by the Court during the evidentiary hearing of December 14–16, 2020. The exhibits can be found at Docket Nos. 664 and 665 of Bankr. No. 15 A 35358.

expenses as a result. (Tr. 281:6–290:25, 304:15–306:15, 399:22–401:1; Pl. Ex. 2 at 14; Pl. Ex. 4 at 2–5.)

Although O'Malley's use of the orderly liquidation methodology resulted in a valuation of the Debtor's assets of approximately $28.4 million as of July 31, 2015, the company's debts as of the same date totaled $47.2 million. (Tr. at 330:6–15; Pl. Ex. 2 at 15.) Indeed, O'Malley testified that, given the Debtor's condition at the relevant time, as well as its operating performance and outlook, he was not able to present credible projections—using *any* valuation approach—showing that the company would be profitable. (Tr. at 284:17–285:2, 330:20–24.)

As for Conway and Keidan, the Debtor's counsel in the Walsh litigation, they testified that they were experts in construction litigation, each having handled twenty to twenty-five trials in that specialty over the course of their careers. (Tr. at 32:10–33:17, 37:3–7, 176:19–177:7.) Both Conway and Keidan kept copious, contemporaneous notes of their conversations with the Debtor in 2015, which reflected their analysis—conducted both before and throughout the preference period—of the Debtor's chances at trial in the Walsh litigation. (Tr. at 72:5–17, 182:1–13; Pl. Ex. 3.)

As counsel for the Debtor in its dispute with Walsh, Conway and Keidan's firm was generally responsible for responding to requests from the Debtor's financial auditors with information related to the litigation. (Tr. at 114:2–13.) Those responses, Conway said, did not express an opinion as to the expected outcome of the litigation. (Tr. at 114:23–115:7.) It was inappropriate under ABA policy to express an opinion on pending litigation and potential trial outcomes, Conway said, because those responses could be discoverable. (Tr. 115:13–116:19.) According to Conway, the last audit response to the Debtor's accountants was on February 16, 2015, five months before the preference period had begun, several months prior to the close of

8

expert discovery in the Walsh litigation, and well before Conway had worked up his specific calculations and arrived at his Walsh liability estimates. (Tr. at 114:35–115:12, 132:3–18.)

Conway testified that by the end of May 2015, he had concluded that the Debtor was unlikely to succeed at trial and subsequently advised the Debtor of that conclusion. (Tr. at 62:5–11, 65:16–19, 67:14–21). Among the significant factors that led to his opinion, Conway said, were the observations of Dr. John Barsom, the Debtor's expert on fracture mechanics who had literally "written the book" on the subject. (Tr. at 52:15–53:4, 62:7–63:3.) Conway testified that based on Barsom's assertions about the quality of the Debtor's welds used on a project at O'Hare Airport—a primary issue in Walsh's case against the Debtor—there would be no way to prevent the trial judge from concluding that the welds created a safety concern that "could not be engineered around." (Tr. at 39:4–23, 40:16–41:6, 54:23–55:14, 62:13–63:20.)

Conway further testified that on several occasions during the preference period he advised the Debtor's officers, including president Michael Goich and vice president David Abshire, that it was likely that the trial would result in a "best-case minimum" net judgment against the Debtor of $8 million to $10 million, not including attorneys' fees and pre-judgment interest. (Tr. 65:22–66:18, 67:14–69:13, 93:11–18; *see also* Tr. at 180:12–21.) Conway said that he also presented his worst-case figures to the company's officers and others: a judgment against the Debtor in the range of $23 million to $33 million, not including attorneys' fees and interest. (Tr. at 68:22–69:13, 93:19–22, 180:12–21.) In discussing his "best case" analysis at trial, Conway described it as:

> an ultraconservative way of demonstrating – of illustrating to the client what I meant when I said Walsh will win. So what it means is the likely result is going to be far worse, plus interest and costs. But look at it this way, there's going to be at least – best case for LB Steel, there's going to be an adverse judgment of 8 to 10 million, and that was enough to put them out of business, and that's what the client needed to know.

(Tr. at 163:18–164:3.) Conway's assessment of the Debtor's trial liability did not change in the month prior to trial, and, Conway said, "by mid-July 2015, the path was set." (Tr. at 69:14–70:14.)

To account for the Walsh litigation, O'Malley added a $17 million contingent liability to his solvency analysis. (Pl. Ex. 2 at 14.) To calculate the appropriate value of the contingent Walsh liability, O'Malley explained that he read Conway's and Keidan's deposition testimony and had various conversations with Debtor's special counsel from Perkins Coie regarding both the status of the litigation and the likelihood of outcomes. (Tr. at 298:5–14.) Based on that information, O'Malley said, he determined what the liability was expected to be. (Tr. at 289:15–17.) To arrive at the actual figure of $17 million, O'Malley testified that he used the dollar amounts from Conway and Keidan's best-case, mid-case, and worst-case outcomes, applying "a one-third probability" that the numbers in each range would be the actual outcome. (Tr. at 299:3–11.)

**U.S. Steel's Evidence in Support of Solvency**

In support of its argument that the Debtor was solvent during the preference period, U.S. Steel offered the testimony of two witnesses. The first, James A. Falconi, was U.S. Steel's expert witness who was hired by the company to determine whether the Debtor was solvent during the ninety days leading up to its bankruptcy filing. (Tr. at 515:6–9, 516:4–11, 517:14–23, 530:5–9.) The second witness was Cindy Blau, the Debtor's former controller and, at the time of trial, the CFO of LB Metals, the entity that ultimately purchased the Debtor's assets. (Tr. at 489:3–21, 490:3–5.)

Falconi testified that the Debtor's assets exceeded its liabilities during the preference period and that, accordingly, the company was solvent at the time in question. (Tr. at 531:4–19; *see also* Def. Ex. 101 at 8, 26.) According to Falconi, the Debtor was a going concern during July, August, and September of 2015 when the payments at issue were made, and the discounted

10

cash flow analysis that he prepared demonstrated that the fair market value of the Debtor's assets at that time was $36.5 million, which exceeded the company's liabilities by an average of $8.6 million. (Tr. at 532:3–25, 534:8–9, 549:20–22, 558:24–559:1; Def. Ex. 101 at 3, 8–10.) To arrive at the asset valuation figure, Falconi said, he examined the Debtor's cash flows for the years 2011 to 2014 and assumed that the company's future cash flows would be similar to the average of those four years. (Tr. 545:18–547:2; Def. Ex. 101 at 10–11, 13.) Falconi particularly "liked" the financial statements for those years, he said, because they reflected the cyclical nature of the steel industry, with positive cash flows for the Debtor in 2011 and 2012 and negative cash flows in 2013 and 2014. (Tr. at 540:15–541:2, 542:9–17, 545:25–546:3, 552:10–17, 555:17–556:9; *see also* Def. Ex. 101 at 11.) He testified that looking at an average of those years was helpful in projecting the Debtor's cash flows for subsequent years. (Tr. at 545:18–546:5, 597:1–9.)

Falconi did not attribute *any* value to the contingent Walsh litigation liability in his analysis. According to Falconi, no dollar amount was included for the dispute between the Debtor and Walsh in the liability calculation because the Debtor did not treat its financial exposure in the litigation as a "probable or reasonably possible" contingent liability during the preference period. (Def. Ex. 101 at 19, 26.) Falconi also testified that he did not assign a value to the Walsh litigation liability because he firmly believed that the parties would settle their dispute. (Tr. at 563:1–564:9 (testifying that "over 95 percent of all civil litigation matters settle").) Further, Falconi testified, the Debtor's financial statements, prepared in accordance with Generally Accepted Accounting Principles (GAAP), did not report any material contingent liabilities, because the Debtor's management did not believe that the outcome of the Walsh litigation or any other litigation would materially affect the company's financial future. (Tr. at 561:2–10; *see also* Def. Ex. 101 at 5, 8, 15–16.) In deciding not to account for the Walsh litigation in his liability analysis, Falconi also

relied on the deposition testimony of both Cindy Blau, the Debtor's controller who prepared the financial statements, and Michael Goich, the company's president. Specifically, Blau testified at her deposition that the Debtor's management thought, during the preference period, that the Debtor would either prevail in the Walsh litigation or had sufficient claims against Walsh, as well as escrow balances, that would financially offset any judgment in favor of Walsh. (Tr. at 561:15–23, 586:3-25; Def. Ex. 101 at 18.) Goich, in turn, testified during his deposition that he thought that the Debtor would prevail in the Walsh litigation and that the Debtor had no contingent liabilities in the ninety days leading up to its bankruptcy filing. (*Id.*; Def. Ex. 102 at 7.)

Blau's testimony at trial was largely consistent with Falconi's in certain respects. According to Blau, the Debtor continued to operate on a business-as-usual basis during the preference period. (Tr. at 496:15–497:13.) Specifically, Blau said, the Debtor was operating all three of its facilities, taking and filling customer orders, buying steel, paying rent, making payroll, providing employee benefits, and generally paying its creditors. (*Id.*) Blau also testified that the steel industry is cyclical in nature and that steel prices—and, thus, market activity—tend to "fluctuate greatly" every two to three years. (Tr. at 492:14–493:15.) She further testified that the Debtor's financial performance typically coincided with the steel industry's market conditions. (Tr. at 493:16–494:19.)

### The Experts' Rebuttals

Each expert found fault with the other's testimony, reports, and conclusions. In addition to disputing the other's analysis and opinions through testimony at trial, O'Malley and Falconi also submitted written rebuttals to each other's expert reports.

Regarding Falconi's analysis, O'Malley took issue with the discounted cash flow approach that Falconi used in valuing the Debtor's assets. In arriving at that valuation, O'Malley

said, Falconi merely took an average of the Debtor's historical cash flows from four years prior to the petition date and then assumed that that average performance would continue on in perpetuity, with 3% added per year to account for growth and inflation. (Tr. at 336:8–14; *see also id.* at 546:23–548:1.) O'Malley explained in his rebuttal report as follows:

> A Discounted Cash Flow ("DCF") valuation should be based on a projection of future cash flows starting at the valuation date. Mr. Falconi does not provide *any* explanation of why a simple average of the prior four years (2011–2014) cash flows, a fivefold (5x) increase from year-to-date September 2015 and the year 2014 results, represents a reasonable projection of future cash flows. As the often used phrase says, "Past performance is not indicative of future results." In fact, EBITDA for the years 2013, 2014 and year to date 2015 were just a fraction of the cash flows of 2011 and 2012. Use of a four year historical average does not properly reflect the trend of LB Steel's profitability during 2013–2015 and its projected cash flows for the balance of 2015 and future years.

(Pl. Ex. 4 at 3; *see also* Tr. at 337:15–338:3.) According to O'Malley, Falconi entirely ignored the Debtor's 2015 cash flows, making instead the incredible assumption that the average of the Debtor's cash flows for the four years prior would be repeated in the future. (Tr. at 336:2–338:3 (noting that the discounted cash flows "weren't based on a future projection of cash flows" at all); Pl. Ex. 4.)

O'Malley also faulted Falconi's analysis for its failure to consider various relevant trends and circumstances. Specifically, O'Malley claimed that the analysis did not take into account internal issues that the Debtor was having with respect to its customer base, inventory adjustments that were needed in response to the current business environment, the assignment of any liability arising from the Walsh litigation, ongoing professional fees that the Debtor was incurring in connection that litigation, and any current or future market conditions. (Tr. at 336:15–20, 341:1–11; Pl. Ex. 4 at 2–5.) As to the latter, O'Malley said, Falconi's analysis failed to account for the fact that the steel industry was in significant decline in 2015 or that, during the first nine months

13

of that year, the Debtor had to temporarily reduce its production levels within two of its business segments and permanently shut down certain of its production facilities and operations, all in response to customer order rates, market demand, economic conditions, and import levels. (Pl. Ex. 4 at 3.)

In addition, O'Malley pointed to a number of other factors that weighed against the credibility of Falconi's projections and analysis. First, O'Malley testified that the Debtor had an unsustainably large inventory of steel plate with little ability to re-sell or use that inventory in fabrication to turn a profit. (Tr. at 291:1–294:7.) Second, O'Malley claimed, the Debtor had no source of liquidity to pay its ongoing obligations other than the existing line of credit from MB Financial. (Tr. at 234:4–237:11.) Finally, O'Malley said, on June 30, 2015, the Debtor defaulted on its loan with MB Financial by violating a certain financial covenant of the agreement, and, as a result, the bank issued a reservation of rights letter on July 31, 2015, based on its concerns about profitability and the inventory levels of the company.[11] (Tr. at 256:3–5, 344:6–345:7, 399:21–401:1; *see* Pl. Ex. 22.)

As for O'Malley's solvency analysis, Falconi claimed that O'Malley made several fundamental errors in arriving at his opinion. First, Falconi said, O'Malley incorrectly applied a "liquidation premise of value," which led to an improper valuation of the Debtor's assets. (Tr. at 565:21–566:4; Def. Ex. 102 at 3–6.) According to Falconi, the liquidation premise was unsupported and contradicted by the evidence that the Debtor was operating as a going concern during the preference period. (Def. Ex. 102 at 3–6.)

---

[11] O'Malley testified that, pursuant to the reservation of rights letter, MB Financial could accelerate collection as a result of the Debtor's default; at the time the letter was issued, however, the bank chose not to accelerate collection but reserved its right to do so. (Tr. at 400:14–19.)

Second, Falconi noted that the trends and circumstances cited by O'Malley did not render the Debtor insolvent during the relevant period. Instead, Falconi said, the negative trends in the steel industry affected all businesses in that industry, not just the Debtor. (*Id.* at 5.) As for the Debtor defaulting on its loan agreement with MB Financial, Falconi pointed out that the bank neither called the loan nor transferred it to its managed asset department during the ninety days leading up to the bankruptcy filing. (*Id.*) Finally, Falconi asserted that the Debtor's inventory adjustments and issues were insufficient to push the company into insolvency. (*Id.* at 5–6.)

Falconi suggested, however, that most critical was O'Malley's incorrect valuation of the contingent liability for the Walsh litigation. Specifically, Falconi claimed, O'Malley completely disregarded the Debtor's contemporaneous balance sheets and other financial information that reflected the expectation and belief of the company's management during the preference period that the Debtor would prevail in the Walsh litigation. (*Id.* at 3–4, 6–7.) Rather, Falconi said, O'Malley relied solely on the deposition testimony of the Debtor's defense attorneys, which was "inappropriate and utterly void of the independent skepticism that financial professionals are required to apply to such analysis." (*Id.* at 6–7.)

## DISCUSSION

### 1.  Avoidance of the Transfers Under § 547(b)

The Committee seeks avoidance of $252,393 in payments made by the Debtor to Steelcast during the preference period pursuant to § 547(b) of the Bankruptcy Code. Under that statutory provision, a trustee (or any party authorized to bring an action on behalf of the bankruptcy estate) may avoid a transfer of the debtor's property to a creditor if the transfer took place shortly before the petition date and enabled the creditor to recover more than it would have in a chapter 7 case. *See* 11 U.S.C. § 547(b). To prevail on a preference claim, a plaintiff must prove that the transfer:

15

(1) was made to or for the benefit of a creditor; (2) was made for or on account of an antecedent debt; (3) was made while the debtor was insolvent; (4) was made on or within ninety days before the petition date; and (5) allowed the creditor to receive more than it otherwise would have if the case were a case under chapter 7 and the transfer had not been made. *Id.*; *see also Grede v. FCStone, LLC*, 746 F.3d 244, 251 (7th Cir. 2014).

Steelcast does not dispute that the transfers at issue were made to or for the benefit of a creditor, for or on account of an antecedent debt, and on or within the ninety days before the petition date or that the transfers allowed Steelcast to receive more than it otherwise would have if the case were a chapter 7 case. The only issue in dispute is whether the Debtor was solvent during the preference period.[12]

The Committee argues that Steelcast has not overcome the presumption of insolvency and that the testimonial and documentary evidence presented at trial establishes that the Debtor was "massively" insolvent during the preference period. (Bankr. Dkt. 696.) Steelcast contends, in turn, that relevant and reliable evidence was presented at trial sufficient to overcome the presumption of insolvency and that the Debtor cannot rely on the contingent Walsh liability claim to convert an otherwise solvent, on-going business into an insolvent one.[13] (Bankr. Dkt. 695.)

Under § 547(f) of the Code, "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f); *see also Barash v. Pub. Fin. Corp.*, 658 F.2d 504, 507 (7th Cir. 1986). Because a preference plaintiff has the benefit of the presumption, the defendant bears the burden of going forward and must

---

[12] Initially, Steelcast contested that it was a creditor for purposes of § 547(b), arguing that the creditor at issue was LLC. (Adv. Dkt. 96 at 5–6.) That matter was resolved against Steelcast by the Court's order of July 24, 2020 on the parties' cross motions for summary judgment (*Id.*)

[13] After the trial, Steelcast filed a "limited post-trial brief" indicating that it was adopting the arguments and evidence as presented in the post-trial brief filed by U.S. Steel. (Adv. Dkt. 107.)

16

produce evidence to overcome the presumption. *See* Fed. R. Evid. 301. Once that burden has been satisfied, the plaintiff must establish by a preponderance of the evidence that the debtor was insolvent on the dates of the transfers in question. *Miller v. Kane (In re Del Grosso)*, Bankr. No. 89 B 06606, Adv. No. 91 A 00713, 1992 WL 280788, at *5 (Bankr. N.D. Ill. Sept. 21, 1992) (citing 11 U.S.C. § 547(g)); *see also In re Taxman Clothing Co.*, 905 F.2d 166, 168 (7th Cir. 1990). Although the presumption requires the party against whom it is raised to come forward with evidence of the debtor's solvency to meet or rebut the presumption, it does not shift the burden of proof. *Chaitman v. Paisano Auto. Liquids, Inc. (In re Almarc Mfg, Inc.)*, 60 B.R. 584, 585–86 (Bankr. N. D. Ill. 1986); *see also Taxman*, 905 F.2d at 168.

Turning to the evidence on solvency that was presented at trial on which the Committee and Steelcast rely, the Court notes that the parties dispute primarily two issues—the methodologies used by the experts to determine the Debtor's assets and the treatment of the contingent Walsh liability. Regarding the first, O'Malley, the Debtor's expert, essentially used a liquidation analysis to value the company's assets, while Falconi, U.S. Steel's expert, conducted a discounted cash flow analysis. As to the second, O'Malley estimated that the Walsh litigation would likely result in a liability of about $17 million. He arrived at this figure by relying on the testimony of the Debtor's litigation counsel, as well as his own knowledge of the Walsh litigation and the parties' inability to reach any kind of settlement prior to trial. Including this figure in his solvency assessment, O'Malley concluded that the Debtor was insolvent. In contrast, Falconi assigned *no* value to the contingent Walsh liability for purposes of his solvency valuation, arguing that doing so would be inappropriate because the Debtor was a going concern, operating on a business-as-usual basis, during the preference period. The Court discusses each of these issues in turn.

## A. Valuation Methodology

17

The Court found the testimony of both experts largely credible in connection with the valuation methodologies that were used. Although the differences between the two methodologies are many, the ultimate valuations were similar, except with respect to the evaluation of the contingent Walsh liability.

Because Falconi determined that the Debtor was a going concern during the preference period, he employed the discounted cash flow methodology in valuing the Debtor's assets. That approach is generally the preferred method of valuation for a business operating on a going-concern basis.[14] *See Brandt v. Samuel, Son & Co. (In re Longview Aluminum, L.L.C.)*, Nos. 03 B 12184, 04 A 01051, 04 A 00276, 04 A 00279, 2005 WL 3021173, at *6 (Bankr. N.D. Ill. July 14, 2005), *aff'd sub nom. Baldi v. Samuel Son & Co. (In re McCook Metals, L.L.C.)*, No. 05 C 2990, 2007 WL 4287507 (N.D. Ill. Dec. 4, 2007), *aff'd sub nom. Baldi v. Samuel Son & Co., Ltd.*, 548 F.3d 579 (7th Cir. 2008); *see 2 Collier on Bankruptcy* ¶ 101.32 (Richard Levin & Henry J. Sommer eds., 16th ed.). The Debtor, however, was highly critical of the way that Falconi actually applied the method to reach his conclusion. Specifically, the Debtor noted that Falconi simply took the average of the Debtor's cash flows from four years prior to the bankruptcy filing and then concluded that cash flows in future years would remain the same, with 3% added annually to allow for growth and inflation. Doing so—and failing to make any projections of future cash flow—the Debtor argued, is not the appropriate way to conduct a discounted cash flow analysis. In response to the criticism, Falconi alleged that his use of the Debtor's historical financial results for the years 2011 to 2014 was simply a starting point in forecasting the company's future cash flows.

---

[14] When a business is a going concern—one that is able to continue operations on a day-to-day basis—a combination of methodologies is often used to value its assets, including discounted cash flow method, actual sale price, adjusted balance sheet method, market multiple approach, comparable transactions analysis, and market capitalization. *Comm. v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007).

U.S. Steel, in turn, criticized O'Malley's use and application of the liquidation methodology for valuing the Debtor's assets. In fact, U.S. Steel said, O'Malley's ultimate valuation and conclusions were inaccurate and unreliable because he used a *forced* liquidation analysis rather than an orderly liquidation analysis.

Given his expert report and testimony at trial, O'Malley's valuation did *not* result from a forced liquidation analysis, and his reason for using the orderly liquidation approach was credible and convincing. As to the latter, O'Malley explained that he determined that the Debtor's orderly liquidation value exceeded its going concern value as a consequence of, among other things, the company's declining revenues in the year of the bankruptcy filing, the losses that the Debtor had sustained since 2013, the "significantly challenged" steel industry in 2015, the company's covenant default on its operating capital loan, and the continuing Walsh litigation in which the Debtor was incurring substantial legal expenses. In arriving at his cash flow projections, Falconi did not account for these trends and circumstances, nor for the Debtor's unsustainably large inventory of steel plate and the company's lack of any source of liquidity to pay its ongoing obligations other than the existing line of credit from MB Financial. Falconi's failure to consider these factors weigh against the credibility of his ultimate findings and projections.

Although O'Malley and Falconi were highly critical of how the other conducted his valuation analysis, the difference in their ultimate findings and opinions results from each expert's treatment of the contingent Walsh litigation liability. Indeed, both O'Malley and Falconi began their analyses with essentially the same balance sheet liability figures for the Debtor. (*See* Pl. Ex. 2 at 21; Def. Ex. 101 at 17.) As discussed below, the experts' treatment of the Walsh liability is the key difference that tips the scale in favor of the Debtor on the issue of the company's solvency during the preference period.

19

### B. Valuation of the Contingent Walsh Litigation Liability

The term "insolvent" is defined in the Bankruptcy Code as a "financial condition such that the sum of [an] entity's debts is greater than all of [the] entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A). Included among an entity's debts and property are contingent liabilities and assets, which must be valued in order to assess a debtor's solvency. *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988). The issue here, whether the Debtor was insolvent during the preference period, hinges in large part on the value of a significant contingent liability—the one with respect to the Walsh litigation.

"By definition, a contingent liability is not certain—and often is highly unlikely—ever to become an actual liability." *Id.* Accordingly, in order to "'value [a] contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real.'" *Baldi v. Samuel Son & Co., Ltd.*, 548 F.3d 579, 582 (7th Cir. 2008) (quoting *Xonics*); *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 659 (7th Cir. 1992) (explaining that "to find the value of a contingent liability, a court must determine the likelihood that the contingency will occur"). Specifically, a contingent liability "must be reduced to its present, or expected, value before a determination can be made [as to] whether [an entity's] assets exceed its liabilities." *Xonics*, 841 F.2d at 200.

Based on the timing of the events in this matter and the documentary and testimonial evidence presented at trial, the Court finds that the parties in this matter should have been able to determine that the Walsh litigation liability was likely to occur and "become real" and that such likelihood should have been reflected by valuing the liability in performing the solvency analysis. Although the Walsh liability was contingent, the discovery in the litigation had been completed and the trial actually took place and was concluded during the preference period, which ran from

20

July 19, 2015 to October 17, 2015. On October 14, 2015—toward the end of that period—the Walsh judgment was entered against the Debtor in the net amount of $19.2 million, and four days later, on October 18, 2015, the Debtor filed for relief under chapter 11. The Debtor's evidence at trial—much of which U.S. Steel's expert chose to disregard—all pointed in the direction of these outcomes.

That evidence established that litigation counsel was intimately familiar with the dispute between the Debtor and Walsh, recognized that Walsh was unwilling to settle for an amount that the Debtor could afford to pay, conducted analysis—both before and throughout the preference period—of the Debtor's chances at trial, and had a good understanding about the likely outcome of the litigation. Armed with that analysis and knowledge, litigation counsel advised the Debtor's officers on multiple occasions during the preference period of the Debtor's chances of prevailing at trial. Specifically, counsel informed the Debtor's management that it was likely that the trial would result in a "best-case minimum" net judgment against the Debtor of $8 million to $10 million, not including attorneys' fees and pre-judgment interest, and a worst-case maximum of $23 million to $33 million, plus attorneys' fees and interest. Given these likely outcomes, O'Malley added a $17 million contingent liability to his solvency analysis to account for the Walsh litigation.

In contrast, Falconi admitted that he ascribed *no* value to the contingent Walsh liability in preparing his analysis. To justify that decision, Falconi provided two primary reasons. Neither is a credible basis for completely disregarding the contingent liability.

First, Falconi said, the liability was not reported on the Debtor's audited financial statements, and, thus, he did not include it in his solvency calculations. Conway, however, credibly explained that the contingent liability was deliberately left off the financial statements, as well as

21

audit responses, because it was inappropriate under ABA policy for counsel to express an opinion on pending litigation and possible trial outcomes. Conway further testified that the last audit response to the Debtor's accountants was in February 2015, several months before both the preference period had begun and Conway had concluded his analysis of likely litigation outcomes.

Second, Falconi claimed that he decided to exclude the contingent liability in his solvency analysis because the Debtor's management did not believe that the outcome of the Walsh litigation would significantly impact the company's financial future. Falconi's reliance on management's impressions and opinions was misguided. It is not surprising that the Debtor's officers and managers remained optimistic about the trial outcome. They had invested ten years and hundreds of thousands of dollars in attorney time in the litigation, and they were trying to stay in business, despite their inability to settle the dispute. As to the latter, Falconi paid no heed to the evidence that Walsh was unwilling to resolve the litigation, concluding instead that the most likely outcome would be settlement of the parties' dispute.

Although Falconi's failure to account for the contingent Walsh liability in his solvency analysis compellingly weighs in favor of the Debtor, the Court does not necessarily agree that O'Malley's figure of $17 million for the liability is conclusively the right one. Specifically, O'Malley's decision to take the dollar amounts from litigation counsel's best-case, mid-case, and worst-case outcomes and apply a one-third probability that the numbers in each of the ranges would be the actual outcome in the litigation seems a bit simplistic. However, subtracting even the best-case liability estimate of $8 million to $10 million plus attorney's fees and costs from Falconi's valuation of the Debtor of $8,616,975 (Def. Ex. 101 at 20) results in a deficit.

For this and all of the other reasons above, the Court concludes that the Debtor was insolvent during the preference period. As such, the Court finds that the Committee may avoid the

22

payments of \$252,393 made by the Debtor to Steelcast in the ninety days leading up to the bankruptcy filing pursuant to § 547(b) of the Bankruptcy Code.

### 2. Recovery of the Transfers Under § 550(a)

In Count III of the adversary complaint, the Committee seeks recovery of the \$252,393 in transfers from the Debtor to Steelcast under § 550(a) of the Code. That statute sets forth the parties from whom avoided transfers can be recovered, *Fisher v. Hamilton (In re Teknek, LLC)*, 343 B.R. 850, 880 (Bankr. N.D. Ill. 2006), and provides, in pertinent part, as follows:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 547 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

Section 550(a) is a statute that works in conjunction with § 547 to provide recovery of transfers found to be avoidable. *Brown v. Caruso (In re Kogos)*, Bankr. Nos. 10 B 05807, 10 B 00764, Adv. Nos. 10 A 01317, 10 A 01318, 2010 WL 4928913, at *6 (Bankr. N.D. Ill. Nov. 30, 2010). Because the Court has concluded that the transfers made from the Debtor to Steelcast during the preference period are avoidable under § 547(b), the Committee is entitled to recover the \$252,393 in payments from Steelcast pursuant to § 550(a), and judgment will be entered in the Committee's favor on Count III of the complaint.

### 3. Disallowance of the Claims Under § 502(d)

Finally, in Count IV of the adversary complaint, the Committee seeks disallowance of any claims that Steelcast (or LLC) may file against the Debtor, unless and until Steelcast returns

$252,393 plus interest due to the Debtor's estate and any other separately filed objections to such claims are resolved under § 502(a). That provision requires the Court to disallow the "claim of any entity from which property is recoverable" under § 550 "or that is a transferee of a transfer avoidable" under § 547, "unless such entity or transferee has paid the amount . . . for which [it] is liable" under § 550. 11 U.S.C. § 502(d). Section 502(d) comes into play when a party authorized to bring an action on behalf of the bankruptcy estate, having successfully avoided transfers under § 547, may recover them under § 550. *See* 4 *Collier on Bankruptcy* ¶ 502.05[1] (Richard Levin & Henry J. Sommer eds., 16th ed.). The statute conditions distributions to the preference defendant on its return of avoided transfers. *Campbell v. United States (In re Davis)*, 889 F.2d 658, 661–63 (5th Cir. 1989).

As discussed above, the payments at issue are avoidable under § 547, and the Committee is entitled to recovery of those payments under § 550(a). However, neither Steelcast nor LLC filed any claims—either pre- or post-petition—against the Debtor's bankruptcy estate, and they are now time-barred from doing so. As a result, the Committee's § 502(d) claim in Court IV is moot.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of the Committee and against Steelcast on Counts I and III of the adversary complaint. As such, the $252,393 in transfers made by the Debtor to Steelcast are avoidable, and Steelcast is ordered to return $252,393 to the Debtor's bankruptcy estate. Count IV is dismissed as moot. A separate order will be entered consistent with this Memorandum Opinion.

Dated: **October 11, 2022**

ENTERED:

Janet S. Baer
United States Bankruptcy Judge